

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00120-CR

———————————————————

JOSE NORBERTO GONZALEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-CR2023-1055

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

Appellant Jose Norberto Gonzalez was convicted of repeatedly violating a protective order and was sentenced to six years' incarceration. After his conviction, Gonzalez moved the trial court to set an appeal bond. The trial court denied the motion because there was good cause to believe that Gonzalez was likely to commit another offense while on bail. Gonzalez appeals from the trial court's order denying his appeal-bond motion, arguing in two points that the trial court erred by (1) admitting into evidence at the appeal-bond hearing a use-of-force report and three inmate-incident reports regarding Gonzalez's behavior in the county jail and (2) improperly considering information from the Public Safety Report System. We will affirm.

## I. Background

On the morning of May 19, 2023, Gonzalez and his wife of 21 years, F.G. (Flora),[1] had a disagreement, and she told him that she wanted to separate. He responded by slapping her across the face. She then tried to leave their home, but as she explained at trial, the situation worsened:

> I was going to get out and I got my keys for the van. [I] said I'm going to call the police . . . . [Gonzalez] grabbed the telephone. He grabbed it and he said, No, you're not gonna call anybody. And he said, And you're not going anywhere, and he grabbed my keys out of my hand.

---

[1]We use an alias to protect Gonzalez's victim's identity. *See* Tex. R. App. P. 9.8 cmt.; 2d Tex. App. (Fort Worth) Loc. R. 7; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

. . . .

. . . [H]e grabbed me and threw me on the floor. . . . [H]e grabbed [a] bat and he hit me right here, and he told me that he could kill me.

And I told him please think about the kids. [I] said you're gonna kill me and you're gonna go to jail and the children are going to be left alone.

And I kept pushing him . . . so I could leave. He still grabbed me . . . on the floor. And then he put his arms around my neck. And he said he wouldn't let me go. And I told him, Just let me leave. . . . I got up and he helped me get up. And then I opened the door and I took off and he went after me.

One of the couple's children[2] called the police, and Gonzalez fled. But police soon found him and arrested him.

Flora filed a protective-order application. On May 22, 2023—four days after the assault—a district court signed a temporary ex parte protective order. Among other things, the temporary order prohibited Gonzalez from committing family violence against Flora and her household and family members, from directly communicating with her and her household and family members, and from going within 100 yards of Flora's residence. The order warned that any violation of its terms could result in criminal penalties. The order further warned that no person, including Flora, could give permission to anyone to ignore or violate any of the order's provisions.

---

[2]After they married, Flora and Gonzalez had three children. In May 2023, the children ranged in age from 13 years old to 19 years old. Gonzalez also has two older children from prior relationships; Flora considers these children to be her own.

3

When a sheriff's deputy served the temporary protective order on Gonzalez (who was still in jail at the time) and started to explain the order's terms, Gonzalez said, "Fuck that," and then ripped the order out of the deputy's hands and threw it into a trash can.

After Gonzalez's release from jail, he violated the temporary protective order twice. On May 26, 2023, Gonzalez went inside the couple's home because he wanted to take a shower. Flora was not at home at the time, but some of their children were. As one of them called the police to report a violation of the temporary order, Gonzalez said, "[P]lease don't call them," indicating his awareness that he was not supposed to be in the home. Gonzalez then hid in one of the children's bedrooms. When law enforcement arrived, an officer found Gonzalez inside the child's bedroom, lying in bed, and covered up with some blankets. The officer arrested him for violating the temporary protective order. Gonzalez acknowledged to the arresting officer that he was aware of the protective order.

Just over a week later, on June 3, 2023, while Gonzalez's mother and some of the children were at the couple's home, Flora—through one of the children—gave Gonzalez permission to come there under the condition that he stay outside. When Gonzalez arrived, he kicked the home's locked front door and demanded that she open it. One of the children opened the door, told Gonzalez that Flora did not want him to come inside, and pushed him away from the door. One of the other children called the police. When a police officer arrived, Gonzalez told the officer that he

4

"knew he wasn't supposed to be over there, but ... he was invited." Gonzalez claimed that Flora had texted him permission to come to the home. But he was unable to provide those text messages to the officer, and the officer could not find any such text messages on Gonzalez's cellphone. The officer arrested Gonzalez for violating the temporary protective order.

On June 14, 2023, a district court signed an agreed final protective order. The final order contained similar prohibitions to those in the temporary order. It granted Flora exclusive use of the couple's residence and, like the temporary order, prohibited Gonzalez from going within 100 yards of it. Also like the temporary order, the final order warned that any violation of its terms could result in criminal penalities and that no person—including Flora—could give Gonzalez permission to violate any of its provisions. The final order was served on Gonzalez in open court.

As with the temporary order, Gonzalez violated the final protective order. On June 24, 2023, while Flora and two of the children were running errands, one of the children received a notification on his cellphone that movement had triggered a security camera he had recently installed outside Flora's home. The child saw live video of Gonzalez lurking around the home's exterior before climbing through a window; the child called the police. Police officers eventually found Gonzalez hiding underneath a bed. Gonzalez was uncooperative and refused to come out. The officers had to drag him out, and he was yelling and belligerent as they arrested him. Flora later saw broken glass beneath the window through which Gonzalez had entered.

Not even a month later, on July 19, 2023, Flora awoke at about 2:00 a.m. to someone crying and knocking on her back door, which leads into her bedroom. When she cracked open the door to see what was going on, Gonzalez forced himself inside. He asked Flora for forgiveness. One of the children called the police. The police arrived and arrested Gonzalez for repeatedly violating the protective order.

A Wichita County grand jury indicted Gonzalez for repeatedly violating a protective order. *See* Tex. Penal Code Ann. §§ 25.07, 25.072. The amended indictment alleged that during a continuous period of 12 months or less—June 24, 2023, through July 19, 2023—Gonzalez had intentionally or knowingly violated the final protective order's terms two or more times on June 24, 2023, and July 19, 2023, by intentionally or knowingly going to or near Flora's residence. *See id.* §§ 25.07, 25.072.

The case was tried to a jury in February 2024. The State presented the evidence summarized above. Gonzalez testified in his defense. He denied slapping Flora, hitting her with a bat, pushing her down, and choking her. He claimed that she was "making that all up." He also complained that he remained confused about why the protective orders had been issued against him.

Gonzalez explained that he had thrown the temporary protective order into the trash because he had been "confused." He claimed that the first time he was arrested for violating the temporary protective order, he did not know that he was prohibited from being at the couple's home because he had thrown away "the papers" and had not read them. He further claimed that he did not know that there was a protective

6

order against him until he was arrested for violating the temporary order for a second time. Gonzalez also testified that after both protective orders had been signed, Flora had contacted him and had enticed him to communicate with her and to meet with her.

On cross-examination, Gonzalez admitted that by June 14, 2023, he knew that a protective order existed because he had agreed to the final protective order's issuance that day. He also admitted to three prior assault convictions for assaults that occurred in 1995, 1997, and 1999, respectively; the victim in the latter two was the mother of Gonzalez's oldest child. Finally, when the State asked him, "[Y]ou're not going to comply with any Court's order, are you?" Gonzalez responded, "I mean, I think I'm innocent."

The jury found Gonzalez guilty of repeatedly violating a protective order as alleged in the indictment and then determined his punishment. Flora testified about domestic-violence incidents that had occurred in 2022: in February or March 2022, Gonzalez grabbed her by the throat, and in August 2022, he hit her with a curtain rod. After hearing other punishment evidence and the parties' closing arguments, the jury assessed Gonzalez's punishment at six years' confinement.[3] The trial court sentenced Gonzalez accordingly.

---

[3]Gonzalez faced up to ten years' confinement, but the jury assessed his punishment at six years. *See* Tex. Penal Code Ann. §§ 12.34(a), 25.072(e). The jury also had the option of recommending that Gonzalez's sentence be suspended and that he be placed on community supervision, but the jury did not do so.

Gonzalez moved the trial court to set reasonable bail pending appeal. *See* Tex. Code Crim. Proc. Ann. art. 44.04.[4] At the start of the hearing on Gonzalez's appeal-bond motion, the trial court stated that it was going to consider information from the Public Safety Report System. The trial court then heard testimony from Gonzalez's witnesses.

Patricia Espinoza, who had been Gonzalez's friend for over a decade, testified that Gonzalez's pretrial bond was never revoked and that if Gonzalez were released on an appeal bond, he had full-time employment lined up with a previous employer, and he could live with her at her home, which is a ten-minute drive from Flora's home. She further testified that she would help monitor Gonzalez's whereabouts and would help him follow any bail conditions, specifically not having contact with Flora. She averred that she would report Gonzalez to the authorities "if he went someplace he wasn't supposed to go." She also testified that Gonzalez's family members would help him make bail and would assist her in monitoring Gonzalez. But on cross-examination, Espinoza admitted that during the case's pendency, she had driven Gonzalez to Flora's home knowing that he was not supposed to be there.

Gonzalez's aunt, Rosa Aguilar, testified that she would help Gonzalez follow his bail conditions, including staying away from Flora. Aguilar claimed that she would report Gonzalez to the court if he violated that condition. Similarly, Flora's neighbor

---

[4]Gonzalez's direct appeal is currently pending before this court in *Gonzalez v. State*, No. 02-24-00150-CR (Tex. App.—Fort Worth filed Apr. 30, 2024).

(and Gonzalez's former neighbor), Stephanie Bishop, testified that she would inform the trial court or "tell probation" if she saw Gonzalez go near Flora's house.

After Gonzalez rested, the State offered into evidence four exhibits—a use-of-force report and three inmate-incident reports—"outlin[ing] disciplinary records in the county jail since [Gonzalez] was remanded to the custody of the sheriff." Gonzalez objected to these exhibits on hearsay, relevancy, and Confrontation Clause grounds. The trial court overruled these objections and admitted the four exhibits into evidence. The State also asked the trial court to judicially notice the evidence and testimony offered at trial. Gonzalez stated that he had no objection and asked the trial court to judicially notice that although the jury had sentenced him to six years' confinement, he was probation eligible. The trial court granted both judicial-notice requests.[5] The trial court also admitted into evidence a copy of Gonzalez's criminal history, which showed that he had been arrested several times since 1994. It also reflected Gonzalez's three prior assault convictions, as well as a 2000 conviction for

---

[5]The same trial-court judge had presided over Gonzalez's trial. *See Ex parte Turner*, 612 S.W.2d 611, 611–12 (Tex. Crim. App. [Panel Op.] 1981) (holding taking of judicial notice at appeal-bond hearing of evidence adduced at prior revocation hearing before same judge proper); *Barrientez v. State*, 500 S.W.2d 474, 475 (Tex. Crim. App. 1973) (holding trial judge presiding over revocation hearing could take judicial notice of evidence adduced at criminal trial over which he presided); *see also Hernandez v. State*, No. 11-16-00278-CR, 2017 WL 1275627, at *2 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op., not designated for publication) ("The trial court acted appropriately when it considered the evidence presented at the prior hearing. Both of the proceedings—the hearing on the motion to adjudicate Appellant's guilt and the hearing on his motion for an appeal bond—were before the same judge." (citation omitted)).

failing to identify. The trial court then reiterated that it would be considering the information in the Public Safety Report System.

Later that day, the trial court signed an order denying Gonzalez's motion for reasonable bail pending appeal, finding that "good cause exists to believe that the [d]efendant is likely to commit another offense while on bail." In its order, the trial court stated that it had considered the testimony and evidence from the appeal-bond hearing, counsel's arguments at the hearing, the court's file, information from the Public Safety Report System, and the testimony and evidence from Gonzalez's jury trial.

Gonzalez timely appealed from the trial court's order and raises two points: (1) the trial court erred by overruling his objections and admitting into evidence the four exhibits related to his disciplinary history in the county jail and (2) the trial court erred by considering information from the Public Safety Report System. We address these points in reverse order because doing so aids in our disposition of this appeal.

## II. Standard of Review and Applicable Law

We review the denial of a request for bail pending appeal for an abuse of discretion. *See Ex parte Spaulding*, 612 S.W.2d 509, 511 (Tex. Crim. App. 1981). When reviewing matters committed to the trial court's discretion, we do not substitute our own judgment for that of the trial court. *See Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). Instead, we ask whether the trial court's decision was made without reference to any guiding rules or principles of law; in other words,

whether the trial court's decision was arbitrary or unreasonable. *See Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). We uphold the trial court's decision as long as it falls within the zone of reasonable disagreement. *See Gonzalez*, 544 S.W.3d at 370.

Article 44.04 allows certain defendants convicted of felony offenses to be released on bond pending appeal. *See* Tex. Code Crim. Proc. Ann. art. 44.04(b)–(c). The primary objective of an appeal bond is to secure the appellant's apprehension if his conviction is subsequently affirmed. *Ex parte Rubac*, 611 S.W.2d 848, 849 (Tex. Crim. App. [Panel Op.] 1981). In weighing bail pending appeal, the trial court should consider factors including the length of the sentence; the nature of the offense; the appellant's work record, family ties, and length of residency; his ability to make bail; his prior criminal record and conformity with previous bond conditions; and any aggravating factors in the offense. *Id.* at 849–50. But a trial court may deny bail altogether "if there . . . exists good cause to believe that the defendant would not appear when his conviction became final or is likely to commit another offense while on bail." Tex. Code Crim. Proc. Ann. art. 44.04(c).

### III. The Public Safety Report System Information

In his second point, Gonzalez argues that the trial court erred by considering information from the Public Safety Report System (PSRS) that was never offered or admitted into evidence.

Article 17.022 of the Texas Code of Criminal Procedure requires a magistrate to consider a public-safety report generated by the PSRS when "considering the release on bail of a defendant charged with an offense punishable as a Class B misdemeanor or any higher category of offense."[6] *Id.* art. 17.022. The PSRS provides, among other things, information about a defendant's criminal history, including information about the defendant's previous convictions, pending charges, and previous failures to appear in court after being released on bail. *Id.* art. 17.021(b).

To support his argument regarding the trial court's consideration of the PSRS information, Gonzalez asserts that

> Neither the State ([n]or the judge) provided [him] with a copy of the Public Safety Reporting System information referenced by the Court as "Exhibit 5" or afforded [him] an opportunity to object to or comment upon this report before the Court ruled on Defendant's bail motion. Exhibit 5 appears in the record as [Gonzalez's] criminal history, but since [he] never had a chance to examine the PSRS he cannot say with certainty what the district court actually reviewed in making his decision.

At the start of the appeal-bond hearing, the trial court notified the parties that it was going to consider information from the PSRS: "[F]or purposes of this hearing, the [c]ourt will also note that it's going to review, consider[,] and take into account the

---

[6]A defendant's right to bond pending appeal is governed by the provisions of Article 44.04 and Chapter 17 of the Texas Code of Criminal Procedure. *Dallas v. State*, 983 S.W.2d 276, 278 n.1 (Tex. Crim. App. 1998), *disapproved of on other grounds by Ex parte Anderer*, 61 S.W.3d 398, 404–05, 405 n.33 (Tex. Crim. App. 2001); *see Ex parte Davila*, 623 S.W.2d 408, 409–10 (Tex. Crim. App. 1981) (stating that after an accused is convicted and initiates postverdict proceedings, Article 44.04's provisions modify and supplement Chapter 17's procedures concerning bail).

12

information in the [PSRS]." Toward the end of the hearing, the trial court asked the State for Gonzalez's criminal history—which the trial court admitted into evidence as Exhibit 5—and reiterated that it was going to consider information from the PSRS:

> THE COURT: And, [the State], do you have a criminal history on this? I saw it in the Public Safety Report[ ] System yesterday, but I'm now getting an error message. Do you have that?
>
> [THE STATE]: I can provide the Court with a copy of his TCIC[7] and that won't be as recent as that, but --
>
> THE COURT: Okay, right. Well, I saw it yesterday, but for some reason I'm now getting an error message within that system. But I have considered what -- or will consider what's in the Public Safety Report[ ] System. So if you could, if you'll get that printed and we'll mark it as Exhibit 5.
>
> [THE STATE]: Yes, Judge.
>
> [DEFENSE COUNSEL]: And if I could get a copy sometime of that? Because I didn't -- I have a limited amount of stuff that I've received from the previous lawyers,[8] Judge.
>
> THE COURT: I understand. And do the parties still rest and close?
>
> [DEFENSE COUNSEL]: Yes.
>
> [THE STATE]: Yes.

Contrary to Gonzalez's appellate argument, Exhibit 5 is his criminal history, not the PSRS information the trial court considered in denying his appeal-bond

---

[7]TCIC stands for the Texas Crime Information Center system. *Ellis v. State*, 535 S.W.3d 209, 211 n.1 (Tex. App.—Fort Worth 2017, pet. ref'd). The Texas Department of Public Safety maintains the TCIC database. *See id.* at 211.

[8]The trial court had appointed Gonzalez different appellate counsel.

request. Gonzalez did not object to the trial court's considering Exhibit 5 or the PSRS information. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). Because it is a systemic requirement, this court should independently review error preservation, and we have a duty to ensure that a claim is properly preserved in the trial court before we address its merits. *Dixon*, 595 S.W.3d at 223.

Here, the trial court twice stated that it was going to consider the PSRS information in deciding Gonzalez's appeal-bond request. At no point did Gonzalez object to the trial court's considering that information, object to the fact that the information was neither offered nor admitted into evidence, or object to his not being able to review and examine the information.[9] He thus forfeited his appellate complaint. *See* Tex. R. App. P. 33.1(a)(1).

---

[9]To his brief, Gonzalez attached two bills of exception complaining that he was not provided with a copy of the PSRS information that the trial court considered and was not afforded an opportunity to object to or comment upon that information before the trial court ruled on his bail-request motion. *See* Tex. R. App. P. 33.2. Gonzalez also attached to his brief email correspondence between his counsel and the trial court regarding his bills of exception. Neither the bills of exception nor the

14

But even if Gonzalez had preserved this complaint for our review, we would overrule it. As the Texas Court of Criminal Appeals has explained, the PSRS report "appears to be confidential information," *Ex parte Gayosso*, 685 S.W.3d 100, 103 (Tex. Crim. App. 2023) (citing Tex. Gov't Code Ann. §§ 411.083, .084), and is generated for the magistrate, not the parties, *id.* at 106–07 (Newell, J., dissenting). Because it is confidential information, "the [PSRS] report that the trial court reviews will *not* be in the appellate record." *Id.* at 103 (Keller, P.J., concurring). Additionally, as we have noted, "[i]t is this court's understanding that . . . when a [trial] court prepares a report using the system, the [trial] court must destroy the report within a short time after the report's preparation." *Ex parte Jones*, No. 02-23-00164-CR, 2023 WL 7400722, at *3 (Tex. App.—Fort Worth Nov. 9, 2023, no pet.) (mem. op., not designated for publication). As the trial court was required to review the confidential PSRS information when determining bail, the trial court did not err by considering the information although it was not offered and admitted into evidence. *See id.* at *2; *see also Gayosso*, 685 S.W.3d at 106–07, nn.15–18 (Newell, J., dissenting) (explaining

emails were filed in the trial court and are thus not in the appellate record. Because they are not in the appellate record, we cannot consider them. *See Booth v. State*, 499 S.W.2d 129, 135 (Tex. Crim. App. 1973); *see, e.g.*, *Sibaluca v. State*, No. 02-19-00150-CR, 2020 WL 6601608, at *8 n.4 (Tex. App.—Fort Worth Nov. 12, 2020, pet. ref'd) (mem. op., not designated for publication); *Erickson v. State*, No. 02-19-00287-CR, 2020 WL 4907364, at *3 (Tex. App.—Fort Worth Aug. 20, 2020, pet. ref'd) (mem. op., not designated for publication).

confidentiality of information generated by PSRS system). We overrule Gonzalez's second point.

## IV. Gonzalez's County-Jail Disciplinary History

Gonzalez complains in his first point that the trial court erred by admitting into evidence a use-of-force report and three inmate-incident reports outlining his disciplinary history while in the county jail because "the information contained therein was inadmissible hearsay and irrelevant and counsel was denied the opportunity to confront and cross[-]examine adverse witnesses." *See* U.S. Const. amend VI; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.25; Tex. R. Evid. 101(e)(3)(C), 402, 801(d), 802.

The challenged exhibits showed that while confined in the county jail after his conviction, Gonzalez (1) had to be physically restrained; (2) had urinated on his jail-cell floor and thrown feces and water under his jail-cell door; (3) had thrown a checkers piece at a detention officer and when the officer instructed him to pack his belongings so that he could be escorted out of the housing unit, Gonzalez refused and then attempted to pull away from officers after they restrained him; and (4) had possessed prohibited items (a tattoo needle and a bottle of what appeared to be "hooch").

Here, Gonzalez was eligible to be released on bond pending appeal given the offense of which he was convicted and the length of his sentence. *See* Tex. Code Crim. Proc. Ann. art. 44.04(b)–(c). This, along with some of the other factors listed

above might have weighed in Gonzalez's favor in setting a bond amount. *See Rubac*, 611 S.W.2d 849–50; *Jeanty v. State*, No. 02-21-00207-CR, 2022 WL 1259065, at *2 (Tex. App.—Fort Worth Apr. 28, 2022, pet. ref'd) (mem. op., not designated for publication). But, assuming without deciding that the trial court erred by admitting into evidence the use-of-force report and the inmate-incident reports, we conclude that, considering the other unchallenged evidence, such error was harmless. *See* Tex. R. App. P. 44.2(a) (explaining that for constitutional error, the court must reverse a judgment of conviction or punishment unless it determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment); *Ellison v. State*, 494 S.W.3d 316, 325 (Tex. App.—Eastland 2015, pet. ref'd) ("Error in admitting evidence in violation of the Confrontation Clause is constitutional error and, therefore, subject to a harm analysis under Rule 44.2(a) of the Texas Rules of Appellate Procedure.").

The trial court concluded that "good cause exists to believe that [Gonzalez] is likely to commit another offense while on bail." *See* Tex. Code Crim. Proc. Ann. art. 44.04(c). The trial court's concern about Gonzalez's propensity to commit further offenses while on bail is supported not only by the nature of the underlying offense—continuously violating a permanent protective order—but also by Gonzalez's twice violating the temporary protective order, his assaulting Flora, his arrest record, his

prior criminal convictions, the PSRS information,[10] and his statements and actions indicating his disregard for court orders. In light of this unchallenged evidence, we conclude that there was not a "reasonable possibility" that the trial court's considering the use-of-force report and the inmate-incident reports might have contributed to the trial court's decision to deny Gonzalez's bail request. *See Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). We thus hold beyond a reasonable doubt that any error did not contribute to the trial court's decision to deny Gonzalez's appeal-bond request.[11] *See* Tex. R. App. P. 44.2(a).

After reviewing the record, we cannot say that the trial court made its decision to deny Gonzalez an appeal bond without reference to any guiding rules or legal principles or that its decision was so arbitrary or unreasonable that it lies outside the zone of reasonable disagreement. *See Gonzalez,* 544 S.W.3d at 370; *Montgomery,*

---

[10]We have followed the court of criminal appeals' directive and have obtained and reviewed the PSRS report. *See Gayosso,* 685 S.W.3d at 103 (explaining that although a PSRS report "appears to be confidential information," an appellate court "can review it through the proper channels" and holding that if a trial court considers the report, it is error for the appellate court to not review it).

[11]Because we hold that any error was harmless under Rule 44.2(a)'s heightened standard, we need not analyze whether any error in admitting that same evidence in violation of the Texas Rules of Evidence violated Gonzalez's substantial rights under Rule 44.2(b). *See* Tex. R. App. P. 44.2(b), 47.1; *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (explaining that the erroneous admission of evidence is nonconstitutional error governed by Rule 44.2(b)); *Ex parte Daigle*, No. 01-21-00311-CR, 2023 WL 4356408, at *4 (Tex. App.—Houston [1st Dist.] July 6, 2023, no pet.) (mem. op., not designated for publication) ("The admission of inadmissible evidence is non-constitutional error, which we must disregard unless it affects the defendant's substantial rights.").

810 S.W.2d at 380. Accordingly, we hold that the trial court did not abuse its discretion by denying Gonzalez bail. *See* Tex. Code Crim. Proc. Ann. art. 44.04(b)–(c). We overrule Gonzalez's first point.

## V. Conclusion

Having overruled Gonzalez's two points, we affirm the trial court's order denying his motion for bond pending appeal.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 22, 2024